## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ADRIAN B.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **Case No. 3:20-CV-1091-MAB[2]** |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Adrian B. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. For the reasons set forth below, the Commissioner's decision is affirmed.

## PROCEDURAL HISTORY

Plaintiff applied for benefits in December 2017, alleging he became disabled as of November 10, 2017, due to problems with PTSD, anxiety, insomnia, depression, panic attacks, flashbacks and nightmares (Tr. 64–65, 168–69, 211, 214). His claim was denied initially in February 2018 and upon reconsideration in September 2018 (Tr. 64–73, 74–90,

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 10).

93-97, 99-102). Plaintiff requested a hearing by an Administrative Law Judge, which was held in October 2019 (Tr. 30, 103–05). Following the hearing, ALJ Carol Boorady issued an unfavorable decision dated June 17, 2019 (Tr. 10–29). ALJ Boorady concluded, in pertinent part, that despite Plaintiff's severe mental impairments, he retained the residual functional capacity to perform work at all exertional levels with certain non-exertional limits to account for his mental impairments, and he could perform a significant number of jobs in the national economy. Plaintiff's request for review was denied by the Appeal's Council, and ALJ Boorady's decision became the final agency decision (Tr. 1–6). Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision.

### THE EVIDENTIARY RECORD

The evidence in the record consists primarily of various reports and forms that Plaintiff and his wife filled out and submitted to the Social Security Administration, Plaintiff's medical records, medical source statements, and the transcript of the administrative hearing before the ALJ. The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is presented in mostly chronological order and is directed at the points raised by Plaintiff.

The records reflect that Plaintiff was born in September 1969 and was 48 years old when he applied for disability benefits in December 2017 (Tr. 64). Plaintiff served in the United States Army for approximately five years, from November 1988 to December 1993 (*e.g.,* Tr. 205). During his time in the service, he spent six months in Iraq during the first

Gulf War, where he was actively engaged in combat (Tr. 550, 588). After leaving the service, Plaintiff worked for various companies until 1997, when he began working for FedEx (*see* Tr. 174–175, 215). He was an over-the-road truck driver for FedEx (Tr. 221, 417), until he stopped working on November 10, 2017, due to his conditions (Tr. 214).

According to Plaintiff, he has had mental health issues since 1993, and was diagnosed with PTSD in 2006 (Tr. 417, 549). He indicated that he had been receiving psychiatric treatment at the VA for his PTSD symptoms consistently since 2006 (Tr. 549; *see also* Tr. 42). That same year, he was awarded disability from the VA for PTSD (Tr. 549).

It appears that Dr. Karen Boesch became Plaintiff's psychiatric provider at the VA as of July 2016 (*see* Tr. 417; *see also* Tr. 42). Plaintiff reported at that time he had weaned himself off all his medications and was medication-free (Tr. 418). Plaintiff saw Dr. Boesch again in January 2017 (Tr. 401–60; 533–38) and August 2017 (Tr. 388–94; 521–26). During both of those appointments, Plaintiff reported that he was feeling well and was using Trazodone as needed for sleep. He also reported that he was considering leaving his job at FedEx for health-related reasons (Tr. 404 ("[E]ver since his accident [in 2013] it is difficult to enjoy and look forward to job"); Tr. 391 ("Mood is ok[;] not depressed but concerned re future and his business[.] Knows he cannot continue with FedEx[;] mind and body cannot tolerate it")). At the January appointment, he said that he and his wife were planning to open a daycare center (Tr. 404). By the August appointment, they had hired a couple teachers, and Plaintiff reported that he needed to get staff lined up before he could get a license and then a loan (Tr. 391). Dr. Boesch renewed Plaintiff's Trazodone

(100mg) but told him that if they needed to increase the dosage, he would not be able to drive for FedEx and would have to go out on leave (Tr. 393).

On November 13, 2017, Plaintiff reported to psychiatrist Dr. Karen Boesch for an "urgent session" (Tr. 382–88; 514–21). Plaintiff was "crying uncontrollably" and "sobbing." He said he could not go on working and driving an 18-wheeler at this time because he felt very unsafe. His nightmares had intensified and his insomnia had worsened; he was only getting two hours of sleep a night for the last month or so. His wife said that if he managed to fall asleep, he was "screaming, running, moving in his sleep the entire time." He had no interest or motivation for activities. He was unable to hold a conversation; he got "lost mid thought" and his wife "freq[uently] needs to ask what he is trying to say." Dr. Boesch similarly noted that Plaintiff's speech was impaired, writing "delay response time[,] difficult to find words at time[s]." Plaintiff also reported that he was more vigilant, checking locks and windows and inspecting his property. He was unable to be around others. The notes indicate that he has "low energy so very tired" and had "severe headaches." Dr. Boesch started Plaintiff on two medications: quetiapine and prazosin and told him to hold off on using his other insomnia medication (Tr. 382, 387; *see also* Tr. 363).[3] She told Plaintiff that he "MUST engage in therapy" and sent the

---

[3] Prazosin is an alpha-blocker typically used to treat high blood pressure, but is also used to treat sleep problems associated with PTSD. MEDLINE PLUS, *Prazosin*, https://medlineplus.gov/druginfo/meds/a682245.html (last visited Feb. 17, 2023). Quetiapine (brand name Seroquel) is an antipsychotic than can be used along with other medications to treat depression. MEDLINE PLUS, *Quetiapine*, https://medlineplus.gov/druginfo/meds/a698019.html (last visited Feb. 17, 2023).

note to other practitioners to contact him about one-on-one-therapy as well as group therapy.

On November 30th, Plaintiff met with a therapist for an assessment and treatment planning (Tr. 369–62; 507–09). He reported "camouflaging" his PTSD for many years. He reported symptoms of nightmares, intrusive thoughts, and feelings of guilt. He also said that he was not working and was out on short-term disability.

On December 4th, Plaintiff saw Dr. Boesch again for medication management (Tr. 362–69; 500–07). Plaintiff reported that he was on leave from work and would feel very unsafe driving a truck because his medications left him groggy for several hours in the morning. Plaintiff reported no change in appetite or energy and said he did not go outside much. But he also said once he "gets [his] day going[,] he is busy around the house" and he watches his young grandchildren (ages 1 and 5). Plaintiff reported worsened headaches, increased anxiety, more intrusive thoughts, edginess, easy startle response, and poor sleep. Dr. Boesch indicated that Plaintiff was alert and oriented, with appropriate grooming and hygiene, he was forthcoming and pleasant, and maintained good eye contact. His mood was "steady," his affect was "fuller but still constricted," his speech was clear with normal response time and no difficulty finding his words, his thought process was linear, his judgment and insight were good, and he denied any suicidal ideations. Dr. Boesch increased Plaintiff's dose of quetiapine and told him to continue using the prazosin and trazadone.

The day after his appointment with Dr. Boesch, Plaintiff submitted his disability application (Tr. 211–19). He indicated that a host of mental conditions—PTSD, anxiety,

insomnia, depression, panic attacks, and flashbacks-nightmares—limited his ability to work, and he had in fact stopped working as of November 10, 2017 due to his conditions. As part of his application, Plaintiff and his wife each filled out Function Reports (Tr. 228–35; 236–43). They reported that he had not been sleeping lately, and had nightmares throughout the night (Tr. 228, 236). He slept about two hours a night or not at all (Tr. 229). Sometimes he talked about not wanting to live (Tr. 228, 236). His medications caused side effects, including headaches, dizziness, drowsiness, and blurred vision (Tr. 235, 243). He also had trouble with his memory, completing tasks, concentration, understanding, and following instructions (Tr. 233, 241). He needed constant reminders (Tr. 233). He did not finish what he starts (Tr. 233). He did not handle stress or changes in routine well (Tr. 234, 242).

Plaintiff and his wife both reported that she had to help him get ready for work, mainly because he had trouble keeping track of his personal belongings, like his keys, his badge, his lunch, etc. (Tr. 229, 337). She also had to remind him to take his medication and take care of personal needs and grooming, like bathing (Tr. 230, 238). Plaintiff no longer prepared any meals and his wife did all of the cooking due to his problems with his memory and concentration (Tr. 230, 238). They said when he used to cook, he left burners on, left the gas on, burned himself, burned towels, cut himself, etc. (Tr. 230, 238, 256). He also no longer paid bills or handled any of their accounts because he got quickly frustrated when he tried (Tr. 231, 232, 239, 240). Plaintiff still did some housework, like washing dishes, taking out the trash, dusting, sweeping/mopping (Tr. 230, 238).

However, his wife had to repeatedly remind him to do those tasks and had to monitor him to make sure they got done (Tr. 230, 233, 238, 256, 257).

At the time of his disability application, Plaintiff was still driving and leaving the house by himself, but he mainly stayed at home (*see* Tr. 231, 232, 239). He occasionally went out with family or friends, maybe once or twice a month, depending on his mood (Tr. 232, 240). But his wife had to remind him when they had plans, who they were seeing, and where they were going (*Id.*). They both stated that he has problems getting along with others (Tr.   233, 241). He "has a short fuse," "gets frustrated at the smallest things," and "get[s] angry really fast" (Tr. 233).

On December 14th, Plaintiff attended therapy again (Tr. 360–62, 498–500). He reported that his medications caused prolonged grogginess, which made him unable to do his normal job driving a truck for FedEx. Plaintiff and his therapist discussed his feelings about his inability to work. She wrote that Plaintiff was "very accepting of his current work limitations" and stated that if FedEx was "unable to accommodate a position of lighter duty then he would be happy to collect his pension and spend time traveling with his wife." Plaintiff remained focused on PTSD treatment as his number one priority. He was going to start in an upcoming therapy group called "Coping with Combat PTSD." They also talked about his headaches.

Later that month, on December 27th, Plaintiff saw Dr. Boesch again for a medication management appointment (Tr. 354–60, 492–97). He reported that he was still not sleeping consistently despite taking his medications regularly. He worried about how he could possibly return to work if his sleep did not improve. He talked about being

angry with his wife over silly things and having suicidal thoughts after they fought. Plaintiff reported feeling more anxiety and anger and being tired all the time. Dr. Boesch indicated that Plaintiff's grooming and hygiene, level of cooperation, and eye contact were all appropriate. His mood was tense, his affect was "variable and congruent but restricted range," and while his thought process was linear, he lost track of his thoughts on a couple occasions. Dr. Boesch wrote that Plaintiff's thought content was "vague and superficial" and he "must be pressed to give details and then he appears more tense in facial expression and posture." His judgment and insight were good, and while he admitted to suicidal ideations, he had no actual intent or plan. Dr. Boesch started Plaintiff on sertraline,[4] in addition to the quetiapine and prazosin.

That same day, Dr. Boesch completed a medical source statement on Plaintiff's behalf (Tr. 943–44). She listed his diagnoses as Chronic Post Traumatic Stress Disorder and Recurrent Major Depression. Dr. Boesch indicated that Plaintiff's medications caused drowsiness and lack of focus. She also opined that, because of his mental impairments, Plaintiff would likely have bad days causing him to leave work early or be absent and he would likely be off-task 25 percent or more of the time. Dr. Boesch further opined that Plaintiff had mild or moderate limitations related to understanding and memory. He was markedly limited in all aspects of concentration and persistence. He was moderately limited in some aspects of social interaction, and markedly impaired in his ability to get

---

[4] Sertraline (brand name Zoloft) is an antidepressant of the selective serotonin reuptake inhibitor class, MEDLINE PLUS, *Sertraline*, https://medlineplus.gov/druginfo/meds/a697048.html (last visited Feb. 17, 2023).

along with coworkers and his ability to maintain social appropriate behavior. He was moderately limited in most aspects of adaptation, with a marked limitation in his ability to respond appropriately to changes in the work setting.

In the month of January 2018, Plaintiff began the "Coping with Combat" group therapy, which he attended three times (Tr. 350–52, 716–17). He also met one-on-one with his therapist (Tr. 352–53), and he saw Dr. Boesch (Tr. 473–79; 703–09). Plaintiff told Dr. Boesch that he found group therapy to be very helpful, but at the same time it had stirred more memories. He reported crying uncontrollably several times a day, continuing to snap, and being highly irritable. He also reported experiencing intrusive thoughts, nightmares, feelings of hopelessness, and passive thoughts of suicide. Dr. Boesch noted Plaintiff's mood was "not good," his affect was flat, and he was "near tears several times." His thought content was focused on "worsening symptoms." The doctor discontinued Plaintiff's sertraline due to side effects and continued just the quetiapine and prazosin. Plaintiff was told to remain off work and not to expect any noted improvement for another four to eight weeks given that they were changing his medication regimen.

Also in January, Dr. Amy Marty conducted a psychological consultative examination of Plaintiff in connection with his application for disability benefits (Tr. 549–553). Plaintiff reported symptoms of PTSD and insomnia. He said he was getting four hours of sleep a night, with difficulty staying asleep. He reported feeling depressed most of the day, every day. Plaintiff also reported difficulty concentrating, difficulty sleeping, lack of self-worth, irritability, isolation, anhedonia. He said he did not like to be in crowds, had difficulty trusting others, and avoided contact with others. He reported

experiencing nightmares and flashbacks, hypervigilance, paranoia, and an exaggerated started response. Dr. Marty noted that Plaintiff was cooperative and engaged during the interview but remained alert and on guard. Rapport was easily established. Plaintiff was coherent, relevant and logical. He had no problems with his language ability or speech. His mood was mildly depressed and anxious. His affect was blunted. He denied any suicidal ideations. Dr. Marty tested various aspects of his cognitive status, like attention and concentration, and memory. Dr. Marty opined that Plaintiff had mild difficulty in ability to learn, recall, and use information. He had mild to moderate difficulty interacting with others. He had moderate problems managing emotions and behavior. And mild difficulty maintaining attention, concentration, persistence, and pace. Dr. Marty wrote that Plaintiff's prognosis was "guarded" and he was "significantly impaired" in his social and occupational functioning.

On February 7, 2018, during the agency's initial review of Plaintiff's disability application, a non-examining agency psychologist, Dr. Leslie Fyans, reviewed Plaintiff's medical records and offered his assessment (Tr. 67–71). Dr. Fyans opined Plaintiff was not significantly limited in his ability to carry out short, simple instructions, but was moderately limited when it came to detailed instructions. Plaintiff was also moderately limited in his ability to maintain attention and concentration for extended periods. Plaintiff was not significantly limited in all other areas, including his ability to work on a schedule and maintain regular attendance, to maintain a routine without special supervision, to work close to others without being distracted by them, to make simple decisions, and to complete a normal workday without interruptions from his symptoms

or an unreasonable number of breaks. Dr. Fyans supported his opinions by explaining that while Plaintiff had PTSD and depression, his mental status exam was within normal limits and he passed the memory tests given by the consultative examiner. The PTSD and depression may inhibit carrying out detailed instructions and extended concentration. But the medical evaluation suggest he still had the cognitive and attentional skills for simple one-to-two step tasks. And his activities of daily living suggest he was capable of carrying out routine chores and tasks. Months later, at the reconsideration stage, another non-examining agency psychologist, Dr. M. W. DiFonso, issued the same opinion as Dr. Fyans (Tr. 74–89).

Plaintiff continued attending group therapy throughout February (Tr. 689–90; 696–98). On February 20th, he saw Dr. Boesch again (Tr. 463–68; 690–96). He reported that the news of a mass shooting had stirred his anger and irritability and increased his nightmares. Plaintiff also reported poor concentration and that he felt easily distracted when driving. Dr. Boesch noted that Plaintiff was still having headaches and passive suicidal ideations. His mood was "up and down[,] mostly agitated[,] snapping at wife." There was nothing abnormal about his affect, speech, thought process, judgment, or insight. She instructed Plaintiff to continue taking quetiapine and prazosin. She also started Plaintiff on bupropion to address his depression symptoms.[5] And if he did not have any side effects from the bupropion, he would start buspar to address his anxiety

---

[5] Bupropion (brand names include, for example, Wellbutrin and Zyban) is an antidepressant used to treat depression. MEDLINE PLUS, *Bupropion*, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Feb. 17, 2023).

symptoms.[6] Dr. Boesch told Plaintiff he should not expect to return to work until June 1 given his medication changes and additional group therapy set to begin in March.

Beginning in February and continuing into March, Plaintiff underwent a series of exams at the VA to evaluate various physical and mental conditions to determine his disability rating (Tr. 652–73; 678–85; 686–89; 698–702). Following these exams, his PTSD continued to be rated as 50% disabling (Tr. 202–10). His headaches were increased from 10% disabling to 50%. And his irritable bowel syndrome was rated for the first time as 30% disabling. His combined rating evaluation was increased from 60% to 80% disabled, as of January 16, 2018.

Plaintiff continued attending the "Coping with Combat" group therapy in March 2018, completing the last session on March 22nd (Tr. 461–62; 673–74; 675–77; 685–86). He was repeatedly encouraged to begin one-on-one trauma therapy (Tr. 457, 459, 460–61, 462), but he declined (Tr. 449, 635). Plaintiff intended to begin another group therapy session in May 2018 focused on nightmares and related sleep issues (*see* Tr. 449, 459, 462, 635), but there is no indication that happened. Also in March 2018, Plaintiff learned that his insurance company had decided to cut off any further short term disability payments, which he was upset about (Tr. 677).

On April 2nd, Plaintiff reported to Dr. Boesch that "'demons' are still hiding" and he was emotionally distanced from his wife (Tr. 454–60; 646–52; *see also* Tr. 451–53

---

[6] Buspar is a discontinued brand name version of the generic drug buspirone. It is an anxiolytic used to treat anxiety disorders. MEDLINE PLUS, *Buspirone*, https://medlineplus.gov/druginfo/meds/a688005.html (last visited Feb. 17, 2023).

(treatment plan)). He reported that he stopped taking the bupropion daily when he was upset with his disability insurance company. He also reported that "[h]e decided to just retire!" He was hoping his wife could open a daycare, but he had also spoken to his brother about a limousine business. Dr. Boesch noted that Plaintiff's appetite and sleep were both good. His mood was "better[,] less stress," his affect was "full [and] bright," and there were no abnormalities with his speech, thought process, judgment or insight, and he denied any suicidal ideations. Dr. Boesch continued Plaintiff on his medications bupropion, prazosin, and quetiapine, at the same dosage.

Plaintiff returned to see Dr. Boesch on May 16, 2018 (Tr. 445–50; 627–34). The nurse described Plaintiff as "pleasant and cooperative," "joking at times." He told the nurse that the daycare business he opened with his wife was "going very well and they [were] full," and said he was "busier now than when working." He likewise told Dr. Boesch that their daycare business was "doing well." But he said outside of the daycare business, conflict with his wife had worsened, they argue, and he felt very detached from her. He said they were "better business partners . . . than husband and wife." He still had negative intrusive thought and nightmares. He also admitted, however, that he was not taking medications as prescribed but only "when I think I need them." Dr. Boesch wrote that Plaintiff's mood was "ok," his affect was "full but overall more constricted than past sessions," there were no abnormalities with his speech, thought process, judgment or insight, and he denied any suicidal ideations. He agreed to resume his medications in an attempt to improve the quality of his sleep.

In June 2018, Plaintiff and his wife each filled out additional Function Reports (Tr.

254–61, 262–69). She wrote:

> My husband's illness is a battle each day, his up and downs of behavior,
> from mood swings, to combative demeanor, and to distance and quiet
> days[.] It's rough. . . . He gets so angry most of the time. It's exhausting. . . .
> He yells and screams most of the time. Only time he's not yelling and
> screaming is if he's asleep and in a depressed mood."

(Tr. 254–55). Plaintiff added that he continued to have migraines and his medication

"keeps me drowsy" (Tr. 262). He wrote, "Death is always on my mind and I know I will

be judge[d] for (killing)" (Tr. 268). Plaintiff's wife continued to have to remind him to do

things throughout the day (like take a shower, eat, do chores, and take his medication)

and to monitor him to make sure he did them (Tr. 254, 255, 257). He rarely drove anymore

and would only do so if his wife was with him (Tr. 257; *see also* Tr. 428). He no longer

went out alone because he had "flashbacks constantly" that made him very upset (Tr.

257, 265). He stayed home unless he and his wife went somewhere together (Tr. 259). He

no longer spent time with others; he said "my anger keeps me from dealing with my

family [and] friends" and his wife said "[h]e gets frustrated and angry just having a

conversation" (Tr. 258, 259, 266, 267). Plaintiff said his memory and attention span were

poor due to medicine, and he therefore had trouble following instructions (Tr. 267).

Plaintiff also had trouble completing tasks and concentrating due to drowsiness (Tr. 267;

*see also* Tr. 259). When it came to stress or changes in routine, Plaintiff's wife said he got

"frustrated," "angry," and ''h[is] behavior is out of control" (Tr. 260). She said "he's angry

all of the time" and when he is not angry, "it's like he is depressed. [His] mood changes

often" (Tr. 260). However, Plaintiff's wife also acknowledged that he had improved on

medication (Tr. 261) ("I am glad that he is [on] medication, without the medication things were really bad. He gets some sleep, more than before. He has quiet moments.").

On June 27, 2018, Plaintiff told Dr. Boesch that his mood continued to fluctuate and he had periods of short temper and irritability (Tr. 612–18). He was still feeling disconnected from his wife. He said he was considering enrolling in school to "keep [his] mind active." He reported that his sleep was fair, with four hours of sleep per night, and his headaches were getting worse. But his mental status exam was normal (*see* Tr. 616–17), with Dr. Boesch noting that Plaintiff was "smiling more and less tense overall," his speech was clear with appropriate response time, rate, and volume, his thoughts were focused on his upcoming short vacation and his relationship with his wife, his thought process was linear, his judgment and insight were good, and he denied any suicidal ideations. Dr. Boesch instructed him to continue the quetiapine and prazosin and to resume the bupropion.

Plaintiff's next appointment with Dr. Boesch was on August 8, 2018 (Tr. 606–12; 747–59). He said he had been doing "fine" and reported taking his medications as prescribed. He said he was excited to begin the sleep/nightmare group therapy the next month. Thoughts of his deployment had increased due to recent news reports of violence and death, and he reported more negative intrusive thoughts. He told Dr. Boesch that he had "FUN" on the trip he took with his wife and was feeling more emotionally connected to her, less depressed, and not as irritable and short fused. He reported that his wife was now on long term disability because of her neck pain, which allowed them to care for grandchildren. His sleep was varied, with frequent awakenings. Dr. Boesch wrote that

Plaintiff's mood was better, his affect was "fuller[,] bright[,] laughing and more relaxed[,]" there were no abnormalities with his speech, thought process, judgment or insight, and he denied any suicidal ideations. Dr. Boesch noted that Plaintiff was "doing well with buproprion," and increased his dosage.

Plaintiff was supposed to start group therapy for sleep/nightmares in early September 2018, but he canceled at the last minute, saying "something came up" (Tr. 820). The following month, he told Dr. Boesch that he did "not have time to devote to therapy given physical needs of his wife" (Tr. 2033). Dr. Boesch noted that Plaintiff was "doing well" and "[t]aking medications as prescribed" (Tr. 1028–33). Plaintiff reported that his mood, energy, motivation, attitude, and sleep had all improved. He was still struggling with negative intrusive thoughts and some nightmares, but his "main source of stress" was his wife, who was struggling with a neck injury and needed his help getting dressed in the morning. Dr. Boesch wrote that Plaintiff "is gladly making himself available to assist her." Plaintiff's mood was "steady," his affect was "full[,] congruent," his speech was clear and normal, his thought content was focused on "need to stay on medication[,] thankful for the treatment as he really does not[ice] improvement," his thought process was linear, his judgment and insight were good, and he denied suicidal ideations. Dr. Boesch continued his medications and stretched the length of time for his next appointment to three months.

On January 4, 2019, Plaintiff told Dr. Boesch that he was "doing okay" and "just dealing with life" (Tr. 1006–14). He denied any suicidal ideations. He reported having mood swings, but also reported that the "down periods never last more than a few days."

He said his appetite was good and his sleep was "fair." Plaintiff told Dr. Boesch that his wife's condition was not improving and he was "helping her around the house." He added that his wife "no longer does daycare" but they "both . . . care for grandchildren," who "keep [him] motivated." There were no abnormalities in his mental status exam (*see* Tr. 1012).

On April 5th, Plaintiff saw Dr. Boesch, who wrote "[a]ll is about the same" (Tr. 988–95). Plaintiff was mostly worried about his wife's health because it was "hard to see spouse decline" and "he has to help her with many activities including dressing because of neck pain and limited [range of motion]" (Tr. 992; *see also* Tr. 996). Dr. Boesch wrote that Plaintiff continued to have negative thoughts of combat, nightmares, vigilance in public, trust issues, and easy startle response (Tr. 992). Plaintiff reported his appetite was good and his sleep was fair, and there were no abnormalities in his mental status exam (*see* Tr. 993–94).

At his appointment on July 26, 2019, Plaintiff told Dr. Boesch he was worried about his upcoming Social Security disability hearing (Tr. 976–83). He also talked about the impact on his self-image of potentially being found disabled and said it has caused him some anxiety and depression. He reported that he was "helping wife a great deal." Plaintiff indicated that his appetite and sleep were both good. There were no abnormalities in his mental status exam aside from his mood being "tense irritable" (*see*

Tr. 980–81). Dr. Boesch prescribed Plaintiff lorazepam and propranolol to take as needed "for the [disability] hearing."[7]

Plaintiff testified at an administrative hearing before ALJ Boorady on October 31, 2019 (Tr. 30–59). He recounted that, while working for FedEx, he had "a near fatal accident" on the job in 2013 "because [he] was having some flashbacks" (Tr. 37, 38). After the accident, he would work for periods of time and then be off for periods of time when he was struggling and had to attend appointments and take medication, which limited his ability to drive a commercial vehicle (Tr. 37; *see also* Tr. 417).[8] He stated he had not worked since November 2017 (Tr. 36). When asked why, he answered, "[d]ealing with the demons inside. Dealing with just the thought of what happened in the Gulf" (Tr. 37). He testified to experiencing guilt because of his time in service and distracting thoughts of the past (T. 39, 41). He explained that he tried "to camouflage it" and push through it to keep working, but "things just started getting worse and worse and worse . . . to where [he] couldn't think properly" (Tr. 37, 38–39, 40). He testified, "at this point now, I still can't deal with it, but I'm trying[.]" (Tr. 37).

---

[7] Lorazepam (brand name Ativan) is a benzodiazepine used to relieve anxiety. MEDLINE PLUS, *Lorazepam*, https://medlineplus.gov/druginfo/meds/a682053.html (last visited Feb. 17, 2023). Propranolol is a beta-blocker that is sometimes used off-label for performance anxiety/stage fright. Kaylea Swearingen, PharmD, *What to Know About Using Propranolol for Performance Anxiety*, GOODRX HEALTH, https://www.goodrx.com/conditions/generalized-anxiety-disorder/propranolol-for-anxiety (last visited Feb. 17, 2023).

[8] Plaintiff explained to Dr. Boesch in July 2016 that there were two periods of time during his career with FedEx where he had to stop working and go out on short term disability because he was on very high doses of medication that prohibited him from driving for FedEx (Tr. 417). The first time was after his near-fatal accident in 2013, and the second was after the death of a "close uncle" in 2015 (Tr. 417).

Plaintiff testified that the medications he takes to help him sleep and manage his depression and anxiety help, but only so much, and they also caused side effects of shaking and grogginess (Tr. 40–41, 44). He said he was not comfortable in crowds and had issues with anger and irritability, which affected his ability to interact with others. (Tr. 42–43, 48–49). His negative intrusive thoughts have intensified in the last couple years, and he is no longer able to simply disregard them and set them aside (Tr. 47). He also has memory problems and headaches, which have both worsened over the last two years (Tr. 46, 47). But he said his biggest problem was suicidal thoughts (Tr. 41).

Plaintiff testified that his wife "does most of everything" around the house, but he was unable to elaborate on specifics other than to say she helps him keep track of his medications and does most of the driving (Tr. 44, 36, 50). He drives himself maybe once a week (Tr. 36). When asked about his wife's current health, Plaintiff testified that she was not working due to her disabling neck pain (Tr. 50). She was still able to do things around the house, but he had to help her with some things, and there were times that she needed more help than others (Tr. 50–52). The ALJ then asked about "this deal when you started a babysitting business" and asked if it was "just your grandchildren?" (Tr. 52). It seems as if Plaintiff was confused about the question, and his answer may have pertained to the daycare that he and his wife opened, which she was no longer able to work at (*see* Tr. 52). The ALJ then specifically asked "[a]re you still watching your grandchildren?" and Plaintiff answered, "Oh, when my grandkids come to the house, yes, ma'am, yes." (Tr. 52). He has two grandchildren, ages three and six (Tr. 51). Although the record is not

exactly clear on the frequency or duration, it seems like the grandchildren are at his house before and after school (*see* Tr. 53).

A vocational expert also testified at the hearing on October 31, 2019 (Tr. 53–58). The ALJ posed a hypothetical to Plaintiff's age and education, who can perform work at all exertional levels but only "able to understand, remember, and carry out simple instructions consistent with unskilled work" and to "tolerate occasional interaction with coworkers and supervisors . . . in small numbers and for short periods" (Tr. 54). The hypothetical person also cannot do tandem tasks and must work "relatively independently with minimal superficial interaction with . . . the general public." (Tr. 54). In response to the hypothetical, the vocational expert testified that Plaintiff's past job would not be available but there was other work available and cited examples of "cleaner industrial," "laundry worker," "cleaner housekeeping," and "folding machine operator" (Tr. 53–54). The vocational expert further testified that these jobs would still be available if the hypothetical person was additionally limited to "simple decision making with only the basic work functions" and "tolerat[ing] only minor infrequent changes within the workplace" (Tr. 55). In response to further questioning from the ALJ, the vocational expert testified that in these types of jobs, employers would not tolerate extra breaks, being off task more than 15 percent of the day, or more than two absences a month on a consistent basis (Tr. 55-57).

## THE ALJ'S DECISION

To qualify for disability benefits, Plaintiff had to prove that he was "[unable] to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).[9]

To determine whether a claimant is disabled, the ALJ conducts a five-step sequential analysis and considers whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021) (citation omitted).

ALJ Boorady's decision followed the required five-step analytical framework (*see id.*). At step one, the ALJ determined that Plaintiff was not presently employed and had not engaged in substantial gainful activity since the alleged disability onset date (Tr. 15). At step two, the ALJ found that Plaintiff had the severe impairments of major depressive disorder, panic disorder without agoraphobia, and chronic post-traumatic stress disorder (as well as a number of non-severe impairments) (Tr. 15–16). At step three, the ALJ determined that none of Plaintiff's conditions, alone or in combination, met or medically equaled a listed impairment (Tr. 16–18). The ALJ then found that Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels

---

[9] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404.

but with non-exertional limitations to account for his mental impairments (Tr. 18).

> The claimant can understand, remember and carry out simple instructions consistent with unskilled work. The claimant can perform only simple decision-making related to basic work functions. The claimant can tolerate only minor, infrequent changes within the workplace. The claimant cab [sic] tolerate occasional interaction with co-workers and supervisors but in small numbers and for short periods, no tandem tasks and work is done relatively independently with minimal, superficial interaction with the general public (Tr. 18).

And at Steps 4 and 5, the ALJ concluded that Plaintiff could not perform his past relevant work, but based on the testimony of a vocational expert, he could be employed as a cleaner industrial (approx. 625,000 jobs nationally), laundry worker (approx. 205,000 jobs nationally), cleaner housekeeping (approx. 371,000 jobs nationally), and folding machine operator (approx. 120,000 jobs nationally) (Tr. 24-25).

<u>Issues Raised by Plaintiff</u>

1. Whether the ALJ erred by failing to include all of the limitations espoused by the State agency consultants (whose opinions the ALJ relied on) in the RFC assessment and corresponding hypothetical question to the vocational expert at the administrative hearing? Specifically, Plaintiff contends that the ALJ should have included a limitation to one-to-two step tasks.

2. Whether the ALJ erred by failing to sufficiently support her decision to discredit Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms?

(Doc. 22, p. 1).

<u>Discussion</u>

The scope of judicial review is limited to determining whether the ALJ applied the correct legal standard in reaching their decision, whether the ALJ's findings are supported by substantial evidence, and whether the ALJ "buil[t] an accurate and logical

bridge from the evidence to [their] conclusion" that the claimant is not disabled. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 42 U.S.C. § 405(g)). The court reviews the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). The court also will not "uphold an ALJ's decision by giving it different ground to stand upon." *Jeske*, 955 F.3d at 587. The ALJ's decision will be reversed "only if the record compels a contrary result." *Deborah M.*, 994 F.3d at 788 (internal quotation marks and citation omitted).

## A. RFC and Hypothetical Posed to Vocational Expert

Plaintiff first argues that the ALJ erred in formulating the RFC because it did not account for all of his limitations (Doc. 22, pp. 7–11). Specifically, the consultants' opinions that the ALJ found persuasive indicated that Plaintiff had "cognitive and attentional skills for simple one and two step tasks" (Tr. at 70, 86). However, the ALJ's RFC assessment did not limit Plaintiff to one-to-two step tasks, which Plaintiff contends was an error. Plaintiff argues that error, in turn, tainted the questions the ALJ posed to the vocational expert, which rendered the entirety of the expert's testimony unreliable.

The Commissioner argues (amongst other things) that even if the ALJ erred in formulating the RFC, the error was harmless because the cleaner-housekeeper job identified by the vocational expert can be performed by a person who is limited to one-to-two step tasks (Doc. 28, p. 5). Indeed, Plaintiff conceded that, according to the Dictionary of Occupational Titles, the cleaner-housekeeping job requires Level 1

Reasoning, which corresponds with a limitation to one-to-two step tasks (Doc. 22, p. 10).[10]

The ALJ indicated there are over 370,000 cleaner-housekeeping jobs in the national economy (Tr. 25), which Plaintiff did not dispute (*see* Doc. 22). *See Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) ("[I]n the context of step five of our disability benefits analysis, it appears well-established that 1,000 jobs constitutes a significant number.") (citation and internal quotation marks omitted). Therefore, any error by the ALJ in failing to include a restriction to one-to-two-step tasks in the hypothetical she posed to the vocational expert was harmless because it is undisputed that the cleaner-housekeeping job is consistent with that restriction and is available in significant numbers in the economy. *See also Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("[T]he harmless error standard applies to judicial review of administrative decisions, and we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). *See also Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 816 (3d Cir. 2016) (finding harmless error under similar circumstances); *Chrismon v. Colvin*, 531 F. App'x 893, 900 (10th Cir. 2013) (same and citing additional cases from the Tenth Circuit); *Jones v. Comm'r of Soc. Sec.*, 492 F. App'x 70, 73 (11th Cir. 2012) (same); *Nicholson v. Astrue*,

---

[10] *See* DOT 323.687-014, 1991 WL 672783 (Jan. 1, 2016) (listing for "Cleaner, Housekeeping" that indicates the job requires "Reasoning: Level 1 — Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."). *See also Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020) (noting that some appellate courts (not including the Seventh Circuit) have concluded that a limitation to one-to-two step instructions disqualifies a claimant from occupations requires reasoning level 2) (citations omitted); *Loos v. Colvin*, 15-CV-215-CJP, 2016 WL 3014811, at *7 (S.D. Ill. May 26, 2016) ("A limitation to simple, repetitive, one or two step tasks corresponds to Reasoning Level 1."); *Mikel v. Commr. of Soc. Sec.*, 14-CV-991-CJP, 2015 WL 7177240, at *6 (S.D. Ill. Nov. 16, 2015) ("[T]he ALJ's written decision in effect limited Ms. Mikel to Reasoning Level 1 in that she was explicitly limited to 'simple, repetitive tasks generally involving one or two steps.'")

341 F. App'x 248, 254 (7th Cir. 2009) (same); *Coleman v. Astrue*, 269 F. App'x 596, 602 (7th Cir. 2008) (same).

### B. Credibility of Plaintiff's Statements Re: Severity of Symptoms

In assessing Plaintiff's RFC, the ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms but Plaintiff's testimony concerning the intensity, persistence, and limiting effects of these symptoms was "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 19). The ALJ questioned Plaintiff's account as to the extent of those limitations given his course of treatment, his activities of daily living, and the reasons he gave for his retirement (Tr. 19, 23). Plaintiff argues that each of the reasons given by the ALJ are flawed (Doc. 22, pp. 13–17).

The ALJ must evaluate the credibility of claimant's own subjective statements about the severity of their symptoms in relation to the other evidence in the record, *i.e.,* whether the statements are consistent with the other evidence. 20 C.F.R. § 404.1529(c)(4). *see also* SSR 16-3p, 81 Fed. Reg. 14166-01. The ALJ must justify their credibility finding with specific reasons supported by the record. *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). So long as the ALJ does, the credibility determination is afforded "considerable deference" and will be overturned only if it is "patently wrong." *Ray v. Berryhill*, 915 F.3d 486, 490 (7th Cir. 2019) (quoting *Terry*, 580 F.3d at 477). *See also Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir.2008) ("Reviewing courts . . . should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported."). "Patently wrong is a high threshold—only when the

ALJ's determination lacks any explanation or support . . . will [we] declare it to be 'patently wrong' and deserving of reversal." *Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021) (quoting *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008)) (internal quotation marks omitted).

Plaintiff first takes issue with the ALJ's finding that he "was inconsistent in the reasons for his retirement" (Tr. 23); (Doc. 22, pp. 13–15). In support of this finding, the ALJ recounted Plaintiff's testimony that he retired "because he could not handle the stress anymore in that his PTSD and depression would not allow him to continue," which she wrote was inconsistent with the medical record indicating that Plaintiff decided to "just retire" (Tr. 23; *see also* Tr. 457). The ALJ also noted that Plaintiff had short-term disability and "became quite upset when he subsequently lost short-term disability payments," which the ALJ thought was "not fully consistent with an inability to no longer drive a truck" (Tr. 23 (citing Tr. 677, 863)). The Court agrees with Plaintiff that the ALJ's analysis is not exactly detailed or well-reasoned. The ALJ did not clearly explain why she thought Plaintiff's statements regarding his retirement were inconsistent, which is particularly problematic because it seems to the Court like the ALJ failed to consider the full context of Plaintiff's statement that he decided to "just retire." The ALJ also failed to explain, and it is not immediately obvious to the Court, why Plaintiff's frustration with losing his short-term disability was inconsistent with "an inability to no longer drive a truck." However, the ALJ's flawed explanation, in and of itself, does not invalidate the entirety of the ALJ's credibility determination because the ALJ provided other reasons for discounting Plaintiff's account. *See Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021)

("Even if [one of the ALJ's reasons] for discounting [claimant's] testimony . . . was not substantiated by the record, we would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding . . . .") (citing *McKinzey v. Astrue*, 641 F.3d 884, 890–91 (7th Cir. 2011))); *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are.") (emphasis in original) (citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)).

Plaintiff next challenges the ALJ's determination that his statements about the severity of his symptoms were inconsistent with his course of treatment (Doc. 22, p. 15–17). He argues that the ALJ "did not identify what about [his] pattern of treatment she found objectionable, which makes it difficult to determine why she felt it was inconsistent with Beamon's allegations" (*Id.* at p. 15). Plaintiff then recounted evidence in the record that was consistent with his statements regarding the severity of his symptoms, including his reports of ongoing symptoms, participation in therapy and support groups, and abnormal findings on mental status examinations, and he argues that the ALJ erred by "overlooking evidence" contradicting her position (*Id.* at pp. 15, 16, 17). He claims that "a longitudinal review of [his] records shows he did not make material progress in controlling his symptoms" (*Id.* at p. 17).

The Court is unpersuaded by Plaintiff's arguments. The ALJ went through select records—Dr. Marty's consultative examination, the state agency psychologists' assessments, and records from Plaintiff's treating psychiatrist, Dr. Boesch—and discussed evidence in these records that was consistent with Plaintiff's statements regarding his symptoms as well as evidence that undercut his statements (Tr. 19–20, 22–

23). Plaintiff himself even acknowledged the ALJ cited treatment notes favorable to his position (Doc. 22, pp. 15–16). This is simply not a case where the ALJ ignored evidence contrary to her conclusion.

Furthermore, the ALJ's decision shows that she weighed the evidence and determined that while it showed that Plaintiff had mental impairments that caused limitations, she believed it also showed that Plaintiff's impairments were not as disabling as he claimed. In support of that determination, she pointed out that despite Plaintiff's claims of mental health issues since 1993, he had never been psychiatrically hospitalized (Tr. 19); his mental status exams were "consistently normal" (Tr. 21, 22, 23); his condition had significantly improved by October 2018 and he was stable on his medications (Tr. 20, 22, 23); and he had chosen to opt out of therapy (Tr. 23). She also once again cited to Plaintiff's statements to medical providers that after he left his truck driving job, he helped his wife open and operate a daycare and was even busier than when he was working for FedEx, he was providing substantial assistance to his wife around the house, and he was taking care of his grandchildren (Tr. 20, 22, 23). The ALJ thus gave specific reasons supported by the record for her determination. Although the ALJ could have weighed the evidence differently, and Plaintiff believes that she should have, that does not make her determination patently wrong. *See Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021) ("The presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence."); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) ("[E]ven if reasonable minds could differ on the ALJ's rejection of

Zoch's testimony, we will not reweigh evidence or substitute our judgment for the ALJ's.").

Finally, Plaintiff challenges the ALJ's determination that his statements about the severity of his symptoms were inconsistent with his activities of daily living (Doc. 22, pp. 17–18). In particular, the ALJ cited to Plaintiff's report in May 2018 that he had his wife were running a successful daycare business and he was busier now than when he was working (Tr. 23). The ALJ also cited to Plaintiff's testimony that he babysat his young grandchildren (*Id.*). Plaintiff argues in his brief that the ALJ mischaracterized the facts surrounding the daycare business (Doc. 22, p. 17); he says that his testimony at the administrative hearing established that the daycare business consisted only of him and his wife taking care of their two grandchildren (Doc. 22, p. 17). The Court is wholly unpersuaded by this argument. It must be noted that the ALJ's questions at the hearing and Plaintiff's response, as well as the ALJ's recitation of that testimony in her decision, were all quite muddled (*see* Tr. 23, 52–53). However, as the Commissioner points out, Plaintiff made a number of previous reports to healthcare professionals that clearly suggest the daycare business that he opened with his wife served more children than just his two grandkids (Doc. 28, p. 12). For example, in January 2017, Plaintiff told Dr. Boesch that and his wife planned to open a "day care center" (Tr. 404). In August 2017, he said they were "still working on daycare business and had hired two teachers but still needed more; he also said he needed "to get building staff etc. in line before he can get the license and then the loan" (Tr. 391). In May 2018, Plaintiff reported the "daycare business is going very well and they are *full*" (Tr. 450) (emphasis added). In other subsequent statements

to healthcare providers, Plaintiff makes clear that while his wife was unable to continue working at the daycare due to her declining health, they still watched their grandkids (Tr. 751, 1012). These statements imply that the daycare business was more than just his two grandkids. In the face of all of these statements, the Court is wholly unpersuaded by Plaintiff's counsel's argument that the daycare business consisted of nothing more than Plaintiff and his wife taking care of their two grandchildren.

For the remainder of his argument regarding his daily activities, Plaintiff recaps the Function Reports that he and his wife filled out, which he claims show that he had a restricted range of daily activities consistent with an inability to manage PTSD symptoms in a work environment (Doc. 22, pp. 17–18). It is not entirely clear what Plaintiff thinks the ALJ's error was. To the extent Plaintiff is contending that the ALJ failed to address the issues that he highlighted from the Function Reports, the Court disagrees. The ALJ acknowledged many of those issues elsewhere in her decision (*see* Tr. 17, 18, 19), which shows she was certainly aware of those issues at the time she evaluated the severity of Plaintiff's symptoms, and it allows the Court to infer that she considered those issues. *See Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021). To the extent that Plaintiff is contending the ALJ erred in weighing the evidence, the Court disagrees. The ALJ obviously thought Plaintiff's claim that his symptoms impacted his ability to do anything more than minimal daily activities was overblown in light of the fact that he helped his wife open and operate a daycare and also routinely babysat his grandchildren. The Court cannot say this determination was patently wrong. Plaintiff's criticism of the ALJ's analysis appears to be nothing more than a veiled request for the Court to reweigh the evidence

and substitute its judgment for the ALJ, which it cannot and will not do.

In sum, the ALJ's credibility determination may not have been flawless, but it was far from "patently wrong." The ALJ gave more than one specific reason that was adequately supported by the record for discounting Plaintiff's subjective reports regarding the severity of his symptoms and the constraints they imposed

## CONCLUSION

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law and that her decision was well-reasoned and supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant

**IT IS SO ORDERED.**

**DATED: February 22, 2023**

                                        s/ Mark A. Beatty
                                        **MARK A. BEATTY**
                                        **United States Magistrate Judge**